```
                    UNITED STATES DISTRICT COURT
                             FOR THE
                        DISTRICT OF VERMONT
```

UNITED STATES OF AMERICA    )
                            )
        v.                  )       Case No. 2:11-cr-140
                            )
STEPHEN WILLIAMS,           )
                            )
        Defendant.          )

## Memorandum Opinion & Order: Defendant's Motion to Suppress

The grand jury returned a one-count indictment charging defendant Stephen Williams with knowingly and willfully possessing with intent to distribute a mixture or substance containing a detectable amount of oxycodone, a Schedule II controlled substance. Williams filed a motion to suppress evidence seized from his person and his holding cell at the Vermont State Police ("VSP") barracks in Brattleboro. He argues the seizure of drugs in his case was the product of an illegal arrest, asserting the police lacked probable cause to arrest him. For the reasons stated below, the motion to suppress is **denied.**

### Factual Background

Task Force Officer ("TFO") Robert Sylvia with the Drug Enforcement Agency ("DEA") in Burlington received information from a Cooperating Individual ("CI") that a man named Stephen Williams would be travelling from New York City to Vermont on

October 20, 2011 with a package of 500-1000 pills, likely concealed in his groin area. The CI also informed TFO Sylvia that Williams would be driving a rental vehicle, a black 2011 Chevrolet Impala with Illinois license plate number L276133. TFO Sylvia then passed along this information to VSP Sergeant Eric Albright and other VSP officers, including Trooper Chris Lora. TFO Sylvia also advised Sergeant Albright that he did not have a positive ID on the suspect but that he had been informed that he had a criminal record involving attempted homicide.

On the morning of October 20, 2011, Sergeant Albright parked his vehicle in view of I-91's northbound lanes just inside of the Vermont state line. He monitored traffic and waited to spot a vehicle matching the CI's description. A few miles further north alongside I-91, Trooper Lora waited in his vehicle to be contacted by Sergeant Albright when the Impala passed Albright's location. In the afternoon, Sergeant Albright saw an Impala matching the CI's description pass his location and he informed Trooper Lora of his observation. When Trooper Lora saw the Impala pass his location, he pulled out to follow it. While following the vehicle, Trooper Lora observed it cross the center line into the high speed lane from the primary lane; he then proceeded to stop the vehicle for the illegal lane change.

Upon stopping the vehicle, Trooper Lora recognized that the license plate number matched the one the CI had provided. Trooper Lora then approached the vehicle to speak with its driver, who identified himself as Stephen Williams from the Bronx, New York. From outside the vehicle, Trooper Lora observed a pack of Red Bull energy drinks, cash, and a single key in the ignition, which was indicative of a rental car. The vehicle was also registered to a rental car company. Based on his training as a police officer, Trooper Lora was aware that persons engaged in drug activity often used rental cars and had significant amounts of cash. Additionally, during their conversation, Williams indicated that the purpose of his visit was to see relatives in Burlington, but he was unable to provide a specific location or name for his family members. Based on his suspicions to this point, Trooper Lora had Williams exit the vehicle and asked for consent to search his person, which Williams granted. Trooper Lora's search found no contraband.

While issuing Williams a warning for the vehicle infraction, Trooper Lora informed Williams that he was suspicious about the purpose of his trip and asked for consent to search the vehicle. Trooper Lora provided Williams with a written consent form and Williams signed the form, giving consent. Trooper Lora began the search and was joined by Sergeant Albright and later Department of Motor Vehicles officer

Mark Heberts and K-9 unit "Duchess Corrie." The officers' search of the vehicle found no contraband but did find two cell phones with batteries removed, a radar detector, $360 in cash, sandwich baggies, and moisturizing lotion. The search also found no luggage of any kind. During her search, Duchess Corrie alerted to indicate the presence of drugs at the driver's side door of the vehicle and the driver's seat.

Once the search was complete, Trooper Lora informed Williams that he believed Williams may have contraband on his person and requested consent to a more thorough search of Williams' person. Williams did not object. Trooper Lora felt what he believed to be a foreign object in the groin area of Williams' pants while feeling the outside of Williams' clothing. Trooper Lora asked Williams what the object was, but he did not reply. Trooper Lora asked Williams to undo his belt so that he could see the object; Williams unbuckled his belt, but did not allow officers to access the object. Williams objected to the search, telling officers that they were violating his rights. At this point, Trooper Lora handcuffed Williams to ensure that the situation would not escalate and to prevent Williams from tampering with any evidence possibly concealed in his pants. Williams was then brought back to the VSP barracks in Brattleboro and detained so that law enforcement could apply for a warrant to further search Williams' person. In his motion to

suppress, Williams refers to this event as an arrest; however, the officers at the scene treated this as a limited detention, not a formal arrest.

After bringing Williams back to the VSP barracks, officers observed Williams in his cell crushing pills on the floor and witnessed additional pills falling from his pants. Officers attempted to stop Williams from destroying the pills. He physically resisted their attempts and continued to try to dump pills from his pants and crush them. The officers then used a Taser to prevent Williams from resisting. They recovered approximately 540 pills and an additional 14 grams of crushed powder from Williams' person and the cell floor. The pills tested positive for containing a detectable amount of oxycodone, a Schedule II controlled substance.

**Discussion**

In his Motion to Suppress, Williams has requested the suppression of "all evidence seized as a result of the illegal arrest." Def.'s Mot. to Suppress 1, ECF No. 20. Williams does not contest the stop of his vehicle, or the initial search of his person and the vehicle, to which he consented.[1] Williams also does not contest the second search of his person during

---

[1] Although Williams' motion was originally in regard to the dog sniff and alert, the dog alert was not included in Trooper Lora's knowledge at the time he initially handcuffed Williams and thus it has no relevance to the question of Lora's justification in bringing Williams to the barracks.

5

which Trooper Lora felt the foreign object in his groin area. However, following the officers' request to unbuckle his belt and reveal the concealed object, Williams did not permit the officers to access the object in his groin area.  Williams objects to the officers' placing him in handcuffs and transferring him to the VSP barracks to prevent him from tampering with any evidence potentially concealed in his pants while they applied for a search warrant.

Williams' motion rests on the grounds that he was arrested without probable cause in violation of the Fourth Amendment when he was placed in handcuffs at the scene and subsequently brought to the VSP barracks in Brattleboro.  The issue at the heart of the defendant's motion is whether Trooper Lora, the officer who placed Williams in handcuffs at the scene, had probable cause to believe the petitioner had committed a felony at the time of the detention.  If so, the arrest would be valid and the evidence uncovered from a search incident to it would be admissible. *See Arizona v. Gant*, 556 U.S. 332, 339 (2009) (citing *Chimel v. California*, 395 U.S. 752, 763 (1969)) (describing the "purposes" of a warrantless search incident to arrest as "protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy" by permitting search of the arrestee's person and the area within his immediate control).

A potential complicating factor, not argued or briefed by either party, is that during the encounter the VSP officers treated the incident as a limited detention, not a formal arrest. Thus, it is not immediately clear whether the Court should scrutinize it as an arrest. Investigative stops and arrests are of course both "seizures" that trigger the protections of the Fourth Amendment. *United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir. 1992). However, a limited detention to continue an investigatory stop requires only reasonable suspicion that a crime is being committed, while making an arrest requires probable cause. *Id.*

If it were necessary to reach the question of whether the move to the barracks was permissible as an investigatory stop, it would raise thorny questions. "If an investigative stop based on reasonable suspicion continues too long or becomes unreasonably intrusive, it will ripen into a *de facto* arrest that must be based on probable cause." *Id*. at 1011. In determining the reasonableness of the stop, the Court considers "the law enforcement purposes to be served by the stop [and] the time reasonably needed to effectuate those purposes" to discover "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 685-86 (1985). "Much as

7

a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." *Id.* at 685.

In certain instances, it may be reasonable to move a suspect to a law enforcement office to continue a detention. *See Glover*, 957 F.2d at 1012 (declining to establish "a *per se* rule that moving from an airport, bus, or train terminal to a police office during a *Terry*-type encounter, for purposes of further investigation, automatically converts an otherwise permissible stop into an impermissible arrest upon arrival at the office" and instead applying a case-by-case approach).

Generally, however, a *Terry* stop ceases to be reasonable in scope when the officer moves the suspect from the location of the stop to a police station. 4 Wayne LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 9.2 (4th ed. 2004); *see Kaupp v. Texas,* 538 U.S. 626, 630 (2003) ("we have never 'sustained against Fourth Amendment challenge the involuntary removal of a suspect from his home to a police station and his detention there for investigative purposes . . . absent probable cause or judicial authorization.'") (quoting *Hayes v. Florida*, 470 U.S. 811, 815 (1985)); *United States v. Smith*, 549 F.3d 355, 360-61 (6th Cir. 2008) (stating that handcuffing and transporting a suspect from the scene of a roadside stop to a

state police post for at least an hour and a half while seeking a warrant to search his person for drugs "rises to the level of arrest"); *United States v. Ponce*, 947 F.2d 646, 651 (2d Cir. 1991) (noting that the officers' decision to detain the defendants for five hours at a police station while applying for a search warrant for their car was "apparently unlawful").

The Court need not address the issue here, however, if probable cause otherwise supported the police action. *Florida v. Royer*, 460 U.S. 491, 507 (1983) ("[T]he fact that the officers did not believe there was probable cause and proceeded on a consensual or *Terry*-stop rationale would not foreclose the State from justifying . . . custody by proving probable cause."); *see also Smith*, 549 F.3d at 361 (stating that officers' effort to get a search warrant "does not compromise the lawfulness of the search," as "the officers' subjective belief about the occurrence of the arrest or the necessity of a warrant" does not guide the judicial analysis). The government labels Williams' removal to the VSP barracks a "detention," and not an "arrest." Nonetheless, it has taken the position that probable cause existed at the time Trooper Lora transported Williams to the VSP barracks and it does not advance the argument that the action would have been constitutional had the officers only reasonable suspicion of criminal conduct. Thus, the Court examines whether probable cause supported the move.

"Probable cause exists where 'the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949) (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)). In examining whether probable cause existed, the court considers the totality of related facts and circumstances at the time of arrest from the perspective of a reasonable police officer. *United States v. Delossantos*, 536 F.3d 155, 159 (2d Cir. 2008). A tip from an informant can constitute reasonably trustworthy information on which to base probable cause, when corroborated by the independent observations of law enforcement. *Illinois v. Gates*, 462 U.S. 213, 233-34 (1983); *Draper v. United States*, 358 U.S. 307, 313-14 (1959).

There are a number of specific factors and events in the totality of circumstances that together contributed to the officers' probable cause to arrest Williams without warrant. The detailed information in the CI's tip was corroborated by the officers' observations of the vehicle's specific make, model, color, year, and license plate leading up to and at the stop. The details were further corroborated at the stop during Trooper Lora's conversation with Williams, which confirmed the

informant's identification of the driver by name and home city as well as his travel plans from New York City to Burlington. The informant's tip regarding Williams' hiding spot for the narcotics in his groin area was also partially corroborated when Trooper Lora felt a foreign object in that location while searching Williams' person. The corroboration of such detail was sufficient to show that the tip was reliable in regard to Williams' smuggling of drugs.

In addition to this corroboration, the officers' observations of the use of a rental car, and the presence of cash, energy drinks, sandwich baggies, moisturizing lotion, two cell phones with batteries removed, and a lack of luggage supplied additional reason to believe Williams was involved in drug trafficking activity based on the officers' training and experience in the field. Williams also could not specify the names of relatives he claimed he was visiting in Burlington or where specifically in Burlington they lived, in spite of stating that he was travelling to Vermont to visit family.

Although none of these factors would independently yield probable cause, viewed together they give a person of reasonable caution the belief that a narcotics-related felony had been committed. As a consequence, Trooper Lora had probable cause to arrest Williams without a warrant and conduct a search incident

to the arrest.  In light of that finding, the evidence taken in Williams' cell cannot be suppressed.

For the reasons stated above, the Court hereby denies Williams' Motion to Suppress.

Dated at Burlington, Vermont this 10th day of July, 2012.

<u>/s/William K. Sessions III</u>
William K. Sessions III
U.S. District Court Judge